# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HIGHFIELDS CAPITAL I LP, HIGHFIELDS CAPITAL II LP, AND HIGHFIELDS CAPITAL III L.P., *Plaintiffs*, v. PERRIGO CO., PLC, JOSEPH PAPA, AND JUDY BROWN, *Defendants*. | **Civil Action No. _____** **Jury Trial Demanded** |

## COMPLAINT

Plaintiffs Highfields Capital I LP, Highfields Capital II LP, and Highfields Capital III L.P. ("Highfields Capital"), by and through their undersigned attorneys, Quinn Emanuel Urquhart & Sullivan LLP, for its Complaint against Defendants Perrigo Co., PLC ("Perrigo" or the "Company"), Joseph Papa, and Judy Brown (together with Perrigo, the "Perrigo Defendants"), hereby state as follows.

## NATURE OF THE ACTION

1.     In their campaign to fend off a hostile takeover of Perrigo by Mylan N.V. ("Mylan"), the Perrigo Defendants made a series of material, false representations and omissions publicly and to Perrigo's shareholders, including to Highfields Capital, and engaged in unfair and deceptive conduct in connection with and about a number of important aspects of Perrigo's business.   In the course of this misconduct, the Perrigo Defendants traveled to Boston, Massachusetts on multiple occasions to meet with Highfields Capital representatives and other Perrigo shareholders and to speak at investor conferences, with the design of convincing them to

reject Mylan's $26 billion bid, falsely representing that the offer "substantially undervalued" Perrigo's business, that Perrigo was engaged in a process of soliciting and obtaining bids from other buyers, and emphatically stating that Perrigo's business commanded a materially higher premium.

2.      Pharmaceutical conglomerate Mylan announced in April 2015 an unsolicited bid to purchase Perrigo for cash and stock worth $205 per share, which was later increased to $246 per share.  Mylan announced its formal tender offer on September 14, 2015.  However, as a result of the Perrigo Defendants' misrepresentations and misleading statements and omissions throughout this time period, a majority of Perrigo's shareholders rejected Mylan's offer on November 13, 2015, resulting in substantial monetary damage to Highfields Capital.

3.      The Perrigo Defendants' misrepresentations and omissions were targeted at areas of Perrigo's business that were of crucial importance to its shareholders in connection with their consideration of Mylan's tender offer.  The Perrigo Defendants then covered up the full extent of their misrepresentations for a lengthy time period, through at least May 2017.  Specifically, the Perrigo Defendants falsely represented substantially in the Commonwealth of Massachusetts— where Highfields Capital's harm was directly felt—and elsewhere, the following:

(i)      That Perrigo maintained historic organic growth of 5%-10% per annum, which commanded a higher premium than Mylan's tender offer.  In reality, Perrigo's historic organic growth was only 0%-1% per annum in the last several quarters leading up to the Mylan bid.

(ii)     That the integration of Perrigo's largest acquisition, Omega Pharma N.V. ("Omega"), had been smooth and seamless, providing strong geographic diversification and substantial, immediate revenue growth to Perrigo's bottom line,

which Mylan's offer failed to consider or take into account.  In truth, not only was Omega substantially underperforming, but its integration with Perrigo had badly stalled in 2015, rendering the claimed synergies and growth opportunities as represented by the Perrigo Defendants nothing more than smoke and mirrors.  The Omega acquisition resulted in a write-off of more than $2 billion—nearly half the total purchase price for Omega.

(iii)   That Perrigo's largest financial asset—the Tysabri royalty stream—was worth $5.8 billion and was increasingly accretive to the earnings power at Perrigo, and that Mylan's offer did not even come close to adequately valuing this asset.  In truth, the fair value of the Tysabri royalty stream was far below $5.8 billion; it was sold for only $2.2 billion in February 2017, completely stunning investors and the market in light of the Perrigo Defendants' material misrepresentations and omissions about Tysabri.

(iv)   That the Perrigo Defendants were engaged in a process of active communications with a number of purported "white knights," including Novartis and Johnson & Johnson, that were offering to acquire Perrigo on far better terms than Mylan.  It was not until after the Mylan deal was rejected that Papa revealed for the first time to Highfields Capital and other shareholders that "Perrigo never ran a process" to engage other potential buyers at all.

(v)   On top of all that, the Perrigo Defendants also knowingly or recklessly issued inflated, completely unrealistic profit forecasts to Highfields Capital and Perrigo's other investors in 2015, which were sharply reduced immediately after the Mylan

deal was rejected. All told, Perrigo's stock declined more than 62% during the period at issue, from 2015 to 2017.

4.     The acts and transactions constituting the unfair or deceptive acts set forth herein that damaged Highfields Capital occurred primarily and substantially within the Commonwealth of Massachusetts, which is where Highfields Capital is managed and where the losses were felt.

5.     Despite the Perrigo Defendants' representations to the contrary—and as the Perrigo Defendants well knew or recklessly disregarded—Perrigo in fact had not been achieving, and was not able to achieve the organic growth rate it touted; was unsuccessful in integrating its largest acquisition, Omega; had covered up the substantial diminution in value of its largest asset, the Tysabri royalty stream; had not run a process with "white knights," as represented; and had knowingly or recklessly provided inflated and unrealistic earnings forecasts.

6.     The Perrigo Defendants' crusade to maintain control over Perrigo as an independent company and to induce the Perrigo shareholders to reject the Mylan deal ultimately worked; as a result of their material false representations, omissions and unfair and deceptive conduct, the majority of Perrigo's shareholders rejected the Mylan deal on November 13, 2015, resulting in substantial harm to Highfields Capital, which suffered approximately $185 million in damages by being deprived of the opportunity to tender its shares in the Mylan tender offer.

7.     Meanwhile, Defendants Papa and Brown maintained control over an independent Perrigo as CEO and CFO, respectively. Had the Mylan deal gone through, Papa and Brown would have lost their positions as CEO and CFO at the hands of the new regime, which would have replaced them with Mylan's existing C-Suite team. Instead, by defeating the Mylan deal, Papa and Brown entrenched themselves in their lucrative executive positions and were handsomely rewarded financially for their unlawful conduct. Papa commanded total compensation of

approximately $19,000,000 and $11,000,000 in 2014 and 2015, respectively, while Brown received total compensation of approximately $6,500,00 and $3,500,000 in 2014 and 2015, respectively.  (Perrigo Form 14A at 30, filed with the SEC on Mar. 17, 2016).  Both Papa and Brown also received "special cash bonuses" of $500,000 and $375,000 and restricted stock worth $1.5 million and $375,000, respectively, specifically for their "key contributions related to Mylan's takeover attempt."  (Perrigo Form 14A, filed with the SEC on Mar. 4, 2016).  After the Mylan deal was behind them, and their scheme started to unravel, Papa and Brown unexpectedly, and abruptly resigned from Perrigo, leaving a virtual financial bloodbath in their wake.

## PARTIES

8.     Plaintiffs Highfields Capital I LP and Highfields Capital II LP are limited partnerships organized under the laws of Delaware; Plaintiff Highfields Capital III L.P. is an exempted limited partnership organized under the laws of the Cayman Islands.  The Plaintiffs' assets are managed by Highfields Capital Management LP, which is a registered investment advisor and fund manager with its headquarters and principal place of business located in Boston, Massachusetts.

9.     Defendant Perrigo is a pharmaceutical company domiciled as of 2013 as an Irish corporation with its corporate headquarters in Dublin, Ireland, and with a principal place of business in Allegan, Michigan.  At all relevant times, Perrigo manufactured, distributed and sold over-the-counter products and prescription pharmaceuticals throughout the United States, including in the Commonwealth of Massachusetts.

10.     Defendant Joseph Papa joined Perrigo in the fall of 2006 as President, Chief Executive Officer, and a Director, and held those roles until April 2016, when he abruptly resigned.  At all relevant times, Papa traveled to and transacted significant amounts of business within the

Commonwealth of Massachusetts, including a substantial amount of the acts and transactions complained of herein.

11.     Defendant Judy Brown was Perrigo's Chief Financial Officer from July 2006 through February 2017, when she abruptly resigned.  At all relevant times, Brown traveled to and transacted significant amounts of business within the Commonwealth of Massachusetts, including a substantial amount of the acts and transactions complained of herein.

## JURISDICTION & VENUE

12.     The claims asserted herein arise under Massachusetts General Law Chapter 93A § 11, and Sections 14(e), 18(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(e), 78r(a) and 78t(a), and also asserts claims for tortious interference with prospective contractual relations, common law fraud, negligent misrepresentation and unjust enrichment.  This Court has jurisdiction over the subject matter of Exchange Act claims pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a).  This Court also has jurisdiction over the Chapter 93A and common law claims pursuant to 28 U.S.C. §§ 1332 and 1367.

13.     This Court has personal jurisdiction over Perrigo.  Perrigo purposefully availed itself of the Commonwealth's laws by transacting business with Highfields Capital, which is managed in Massachusetts; by contracting or supplying services or things in Massachusetts; and by causing harm and injury to Highfields Capital in Massachusetts.

14.     This Court has personal jurisdiction over Joseph Papa and Judy Brown.  Papa and Brown purposefully availed themselves of the Commonwealth's laws by each transacting business with Highfields Capital and Perrigo in Massachusetts, contracting or supplying services or things in Massachusetts, and causing harm and injury to Highfields Capital in Massachusetts.

15.     Venue is proper in this Court pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §§ 1391(b)(2).  A substantial part of the acts and conduct that constitute the violations of law complained of herein occurred in the Commonwealth, substantial harm was incurred by Plaintiff Highfields Capital here, and the Perrigo Defendants regularly transacted business in Massachusetts.

## FACTUAL ALLEGATIONS

**A.**     **Highfields Capital Invested Hundreds of Millions of Dollars in Perrigo.**

16.     Highfields Capital is managed by Highfields Capital Management LP, which is a registered investment advisor headquartered in Boston, Massachusetts, founded by Jonathan Jacobson in 1998.  Before founding Highfields Capital Management LP, Mr. Jacobson worked as an options trader at Merrill Lynch and Lehman Brothers, and then spent eight years as an equity portfolio manager for the Harvard Management Company.  Throughout their operation, Highfields Capital Management LP and Plaintiffs Highfields Capital have sought value-oriented investments, managing private investment funds for endowments, charitable and philanthropic foundations, as well as pension funds and institutional investors.

17.     At all relevant times, Highfields Capital Management LP was comprised of a small group of executives, portfolio managers and analysts who attended daily morning meetings to discuss and analyze current and potential investments.  While the portfolio managers were charged with the ultimate investment decisions, they made those decisions collaboratively with input from the team, and particularly with the analysts who researched the particular assets, industries and markets.

18.     In keeping with its value-oriented investment policy, Highfields Capital Management LP began researching a potential investment on behalf of Plaintiffs Highfields

Capital in Perrigo in late 2014 into early 2015. Perrigo had a large portfolio of consumer and cash products, with a substantial over-the-counter product business both domestically and globally, and was considered a prime candidate for a potential acquisition that would further strengthen its footprint in the industry while maximizing value to its shareholders.

19.     After Highfields Capital Management LP performed due diligence of the Company, Highfields Capital made its first investment in Perrigo in February 2015. Over time, Perrigo became a very sizeable investment at Highfields Capital, acquiring a $700 million position in the Company by making purchases of Perrigo's common stock throughout the period February 27, 2015 through April 26, 2016. Highfields Capital was a Perrigo shareholder and owner of a sizeable quantity of Perrigo's common stock as of November 13, 2015, when the Mylan deal was rejected by a majority of Perrigo's shareholders.

**B.      Mylan's Unsolicited Bid for Perrigo Offered a Strong Value Proposition to Perrigo's Shareholders, But Was Rejected by the Majority of Perrigo's Shareholders Because of the Perrigo Defendants' Fraud and Unfair and Deceptive Conduct, Causing Substantial Harm to Highfields Capital.**

20.     Shortly after Highfields Capital made its first investment in Perrigo in February 2015, Mylan announced its unsolicited bid to purchase Perrigo in April 2015 for cash and stock worth $205 per share.

21.     Mylan's initial offer of $205 per share on April 8, 2015 represented a premium of more than 25% above the price at which Perrigo shares had closed the prior trading day, and was substantially above any price at which Perrigo shares had traded during the entire history of the Company. Indeed, in the public offer letter from Mylan's Chairman of the Board, Robert Coury, to Defendant and then-Perrigo CEO, Joe Papa, Coury noted:

Specifically, we propose to offer Perrigo shareholders $205 in a combination of cash and Mylan stock for each Perrigo share, **which represents a greater than 25% premium to the Perrigo trading price as of the close of business Friday, April 3, 2015**, a greater than 29% premium to Perrigo's sixty-day average share price and a greater than 28% premium to Perrigo's ninety-day average share price.

**Our proposal provides a very significant cash payment to Perrigo shareholders.**  In addition, even with conservative assumptions for what we believe to be significant and meaningful synergies coming from both companies, our proposal provides Perrigo shareholders with an even greater equity value in a combined company than they currently have in Perrigo today.

(*See* Form 425, filed by Mylan on Apr. 8, 2015) (emphasis added).

22.  In response to Mylan's announcement, investors sent both Perrigo's and Mylan's stocks sharply higher.  There was general consensus among analysts that the combination of Perrigo and Mylan would be a very positive one, both strategically and in terms of maximizing value to their respective shareholders.  For example, one market analyst and commentator publicly expressed the view that the two companies "would be a match made in heaven."  UBS indicated that the combined stock of the companies would move higher over the course of the next year, and Barclays further noted that "a combination between MYL and PRGO would offer a unique value proposition to their customers."  An analyst at Bank of America/Merrill Lynch observed, "[f]rom a business combination perspective, this makes sense to us as it brings together two companies with arguably best-in-class operations in the generic (MYL) and OTC [over-the-counter] (PRGO) spaces."  A Deutsche Bank analyst similarly stated that "the combination of these companies makes a lot of strategic sense. . . .MYL represents a de-risking as PRGO would otherwise be in a multi-year globalization phase."  (*See* Summary of Analyst Opinions at Slide 32, Form 425 filed by Mylan on May 5, 2015).

23.     Nevertheless, on April 21, 2015, Perrigo rejected Mylan's bid, falsely representing to shareholders that Mylan's $205 per share bid "substantially undervalues the Company and its growth prospects," and that the offer "does not take into account the full benefits of the Omega Pharma acquisition."  (*See* Perrigo Investor Presentation at Slide 3, Ex. 99.2 to Form 8-K filed with the SEC on Apr. 21, 2015).

24.     Three days later, Mylan increased its bid.  Specifically, on April 24, 2015, Mylan made a legally binding commitment to tender $60 cash plus 2.2 Mylan shares for each Perrigo share tendered.  At Mylan's closing price that day of $76.06, the revised bid was worth over $227 per share.  However, Perrigo rejected this offer as well, and encouraged its shareholders to do the same.

25.     On April 29, 2015, Mylan again increased its bid for Perrigo, this time to $75 cash plus 2.3 Mylan shares for each Perrigo share tendered.  At Mylan's closing price that day of $74.50, the revised bid was worth over $246 per share.  Again, Perrigo rejected Mylan's latest offer, and urged its shareholders not to tender their shares.

26.     On September 14, 2015, Mylan commenced its formal tender offer to purchase Perrigo's shares at the $246 per share offer, which amounted to a tender offer for all of Perrigo's shares for approximately $26 billion.  The deadline to tender shares was November 13, 2015, and the offer required that at least 50% of shares be tendered by Perrigo shareholders.

27.     As detailed below, the Perrigo Defendants made a number of material misrepresentations and misleading statements and omissions publicly and to Perrigo's shareholders, including substantially and primarily in the Commonwealth of Massachusetts during face-to-face meetings with Highfields Capital representatives and at investor conferences held in Boston, all in an effort to defeat Mylan's offer, during the period April 8, 2015 through November

13, 2015.  The Perrigo Defendants then continued to conceal the true state of Perrigo's business at least through May 2017.

28.     As the Perrigo Defendants continued to misrepresent the state of Perrigo's own business and to urge shareholders to reject the Mylan offer, the price per share of Perrigo's stock began to drop, as detailed herein.

29.     The Perrigo Defendants' crusade against the Mylan deal worked.  On November 13, 2015, the tender offer was rejected by a majority of Perrigo shareholders, with less than 50% of the Perrigo investors tendering shares, ending Mylan's takeover bid.  Highfields Capital suffered approximately $185 million in damages as a proximate result of the Perrigo Defendants' fraud, deceit and misconduct.  Indeed, shortly after the tender offer failed, Perrigo's shares traded at only $146.90.

**C.     In Their Efforts to Defeat the Mylan Deal, the Perrigo Defendants Touted 5%-10% Organic Growth as the Foundation of Perrigo's Historic and Future Business.**

30.     At all times relevant hereto, the Perrigo Defendants knew that Perrigo's historic and future organic growth was a key factor to its investors.  In their zealous effort to defeat Mylan's tender offer and entrench themselves in their lucrative C-Suite positions at an independent Perrigo, Defendants Papa and Brown represented publicly and to shareholders, including Highfields Capital, that Perrigo was continuing to experience its historic organic growth of 5%-10% per annum.  The Perrigo Defendants touted that Perrigo's average historic organic growth was 7%-8% during Papa's tenure as Perrigo's CEO, and that Mylan's bid significantly undervalued that organic growth to shareholders.

31.     However, the Perrigo Defendants had been materially misrepresenting the strength of Perrigo's historic and future organic growth rates since at least early 2014.  In early 2014, Papa stated that organic growth had accounted for half (8%) of Perrigo's 15%-16% revenue growth over

the past four years, and that the Company targeted organic growth of 5%-10% during any rolling three-year period. (*See* Dominic Coyle, *Takeover of Elan the perfect fit in Perrigo's prescription for growth*, IRISH TIMES (Feb. 7, 2014), *available at* https://www.irishtimes.com/business/health-pharma/takeover-of-elan-the-perfect-fit-in-perrigo-s-prescription-for-growth-1.1682196).

32.     However, by blending older, high growth periods with lower, new growth periods, the Perrigo Defendants manipulated the organic growth rate figures they were citing to their shareholders and to the public.  The Perrigo Defendants then continued to tout those false and misleading performance numbers in their efforts to defeat Mylan's offer.  Indeed, Defendants Papa and Brown made these specific misrepresentations to Highfields Capital in Boston, as well as to other investors in Boston as well, including Fidelity, which had an even larger share of Perrigo stock than Highfields Capital, and which as a result of the Perrigo Defendants' misrepresentations, rejected the Mylan tender offer.

33.     On a number of occasions during the time the Mylan tender offer was under consideration by Perrigo's shareholders, the Perrigo Defendants doubled down on their misrepresentations with respect to the Company's organic growth rate, both reaffirming the purported accuracy of Perrigo's historic organic growth rates and touting their ability to achieve similarly high organic growth for the next three years, based on that purported (but false) historic growth rate.

34.     For example, on April 21, 2015—shortly after Mylan announced its unsolicited bid—the Perrigo Defendants held an investor presentation, which Highfields Capital representatives and other investors attended, with the objective of maintaining Perrigo as an independent company, with Papa and Brown at the helm.  They claimed that an independent Perrigo was worth more than Mylan's offer because Perrigo had a "compelling growth strategy"

with a "proven history of meeting our goals," citing the false organic growth figures of 7%-8%

between 2011 and 2014 and trumpeting the "ability to keep delivering" that same organic growth

of 5%-10% for years to come.  (*See* Perrigo Investor Presentation at Slides 3 & 10, Ex. 99.2 to

Form 8-K filed with the SEC on Apr. 21, 2015).  Moreover, during his oral presentation, Papa

claimed that:

> Simply put, the Board believes that continued execution by the management team against our existing global growth strategy will deliver superior shareholder value.  **Perrigo has a long history of driving shareholder value through consistent, above-market growth and we are exceptionally well positioned to continue to deliver superior growth and shareholder value as we build our strong independent future.**
>
> **We're just back from the Board meeting in Ireland and I'm thrilled to talk to you about our future growth prospects, which gives me great confidence that our strong durable base will enable us to achieve our goal to grow our net sales by 5% to 10% into the future.  We continue to grow at this rate on a significantly bigger base, but there is significant potential upside not included in the CAGR goal.  To reiterate this, our growth goal is purely organic.**  We have historically delivered a balanced mix of organic and inorganic growth, which we expect to continue into the future.  We also see substantial upside for Perrigo on the horizon over and above this three-year goal.

(THOMPSON REUTERS STREETEVENTS, Perrigo's Joseph C. Papa Presentation on Q3 2015 Results

– Earnings Call Transcript, Apr. 21, 2015) (emphasis added).

35.     Perrigo dubbed its growth strategy "base plus plus plus," depicted by a pyramid whose foundation was the false and misleading 5%-10% historic organic growth and projections based upon that purported historic growth.  (*See* Perrigo Investor Presentation, Ex. 99.2 to Form 8-K filed with the SEC on Apr. 21, 2015).



36.     The Perrigo Defendants presented this "base plus plus plus" strategy to their shareholders, including directly to several of Highfields Capital's representatives and others in Boston.

37.     Perrigo also issued a press release on April 21, 2015, stating in relevant part that:

> Following a thorough review, advised by its financial and legal advisors, the Board unanimously concluded that the [Mylan] Proposal substantially undervalues the Company and its future growth prospects and is not in the best interests of Perrigo's shareholders.
>
> **The [Mylan] Proposal would deny Perrigo shareholders the full benefits of Perrigo's durable competitive position and compelling growth strategy, which is reflected in the Company's three-year organic net sales compound annual growth rate (CAGR) goal for calendar 2014 to 2017 of 5-10%.**
>
> The Board believes the [Mylan] Proposal substantially undervalues Perrigo and its growth prospects and that continued execution by the management team against our global growth strategy will deliver superior shareholder value. **Perrigo has a long history of driving above market shareholder value through consistent growth with a focus on profitability and operational excellence, which is reflected in our organic net sales CAGR goal of 5-10% for the next three years** . . . . We will continue to capitalize on our durable competitive position by expanding our international platform organically and through future synergistic deals.

(*See* Perrigo Press Release, Apr. 21, 2015) (emphasis added).

38.     On May 6, 2015, during the pendency of the Mylan tender offer, Papa spoke to investors at the Deutsche Bank Health Care Conference held in Boston, Massachusetts. During his speech, attended by Highfields Capital and other Perrigo shareholders, Papa again misrepresented that Perrigo's "top line organic growth was 5-10%." Indeed, Papa made Perrigo's purported (but false) organic growth rates a highlight of his speech at the conference in Boston, stating:

> We believe we have a business that will grow 5% to 10%, organically. So, **we believe we can grow revenue 5% to 10% organically in our base business.**
>
> What we've always said is, what's most important for us is to continue to execute on our business, show that 5% to 10% compound annual growth rate.

> **Historically, what we've been able to do is actually, we've done right in the middle of that.  We've done about 8% compound annual growth rate organically.  And then we supplemented that with another approximately 7% to 8% of inorganic opportunity.  Those were the things we're going to continue to do.  And that's why I think the Board is very comfortable in stating that we felt the Mylan offer substantially undervalues the company.**

(THOMPSON REUTERS STREETEVENTS, Perrigo at Deutsche Bank Health Care Conference Transcript, May 6, 2015) (emphasis added).  During that conference in Boston, Perrigo's then-CFO Brown joined in the fraud and misconduct, representing that "[w]e have met our consolidated organic-only goals in the past and fully intend to do so in the future.  Looking forward, our goal is to once again deliver an organic net sales CAGR for the next years in the 5% to 10% range while off a significantly larger base."  (*Id.*).

39.     Five days later on May 11, 2015, while hosting several of Highfields Capital's representatives at Perrigo's offices in Allegan, Michigan, Papa and Brown again represented to Highfields Capital that Perrigo has "historically generated 8% organic growth," and that incremental margins from organic growth are very high because "everything really drops to the bottom line"—a key statistic consistently cited by the Perrigo Defendants both in Boston and elsewhere to defeat the Mylan deal.

40.     The Perrigo Defendants also participated in the Bank of America Merrill Lynch Health Care Conference with Highfields Capital representatives and other Perrigo shareholders in attendance, during which Papa stated to shareholders:

> **I think the biggest challenge we have right now is that we just don't see the [Mylan] offer that's on the table as being equivalent to what we think the value of the Perrigo Company is.  So we think it substantially undervalues the Company.**  Given that, what's incumbent on me and the Board of the Company and the executive committee is [to] make sure that we continue focus on driving the business, **making sure that we continue to deliver on**

**the 5% to 10% compound annual growth rate**, continue to deliver on really the bottom line.

(THOMPSON REUTERS STREETEVENTS, Perrigo at Bank of America Merrill Lynch Health Care Conference Transcript, May 12, 2015) (emphasis added).

41.     Similarly, on June 2, 2015, the Perrigo Defendants participated in the Jefferies Global Health Care Conference with Highfields Capital representatives and a number of other Perrigo shareholders in attendance, and stated that "historically, Perrigo has grown by about 5% to 10% annually.  Specifically, it has grown about 8% organically, and we've grown about 8% inorganically on an annual basis."  (*See* THOMPSON REUTERS STREETEVENTS, Perrigo at Jeffries Global Health Care Conference Transcript, June 2, 2015).

42.     As part of their ramping up their campaign against the Mylan tender offer in the summer and fall of 2015, Papa and Brown also flew out to Boston, Massachusetts on several other occasions to meet directly with Highfields Capital representatives, as well as with other Perrigo shareholders located in Boston, including Fidelity.  For example, on August 6, 2015 at Highfields Capital's offices in Boston—despite their knowledge or reckless disregard of contrary information—Papa and Brown specifically referred to Perrigo's purported historic annual growth rate of 5%-10% and on that basis represented that they believe the "5%-10% organic growth" would continue to be achieved over the next three years.  On that same day, August 6, Perrigo issued another investor presentation, reiterating that organic growth remained intact and claiming to have a "strategy for delivering 5%-10% organic growth" going forward for the next several years.  (Perrigo Investor Presentation at Slide 26, Ex. 99.1 to Form Schedule 14D-9 filed with the SEC on Aug. 6, 2015).

43.     Using Perrigo's purported (but false) organic growth rates to defeat the Mylan deal, the Perrigo Defendants also issued a letter to shareholders on September 17, 2015, urging them to reject the offer because "[w]e are confident in our 5%-10% three-year organic revenue CAGR goal, **as executed historically**, and we expect to meet our financial targets in the years to come, creating value for you well in excess of Mylan's offer, and with less risk." (*See* Perrigo Press Release, Ex. 99(a)(1) to Amended Form Schedule 14D-9 filed with the SEC on Sept. 17, 2015) (emphasis added).  On that same day, September 17, the Perrigo Defendants attended the Morgan Stanley Global Healthcare Conference with Highfields Capital representatives and a number of other Perrigo shareholders in attendance, and similarly represented that: "[w]e try to focus on quality, affordable healthcare.  And for us that's been a big driver of our average growth rate of somewhere around 5% to 10% organic . . . . Our goal is to continue to drive organically 5% to 10% growth rate."  (Transcript of Perrigo CEO Joe Papa Presentation at Morgan Stanley Global Healthcare Conference, Sept. 17, 2015, *available at* https://seekingalpha.com/article/3518596-perrigos-prgo-ceo-joe-papa-presents-morgan-stanley-global-healthcare-conference-transcript).

44.     The next day, on September 18, 2015, Papa and Brown again flew to Boston and met with Highfields Capital representatives, as well as other shareholders such as Fidelity.  At these meetings, Papa and Brown reiterated similar representations about Perrigo's historic "robust" organic growth and said that "there is more to come from the Perrigo side" and that the Mylan offer is a "bad deal."  As they well knew or recklessly disregarded, Perrigo's recent historic organic growth did not come even close to the percentages they touted.

45.     Nevertheless, in their continued effort to defeat Mylan's tender offer, Papa and Brown flew to Boston yet again to meet with Highfields Capital representatives and other shareholders on October 22, 2015.  At that point, the deadline to tender shares in response to

Mylan's offer was less than one month away.  Accordingly, while in Boston on October 22, the Perrigo Defendants augmented their representations about Perrigo's organic growth, issuing lofty baseline earnings per share based on "CY2016 Segment Revenue Guidance" that incorporated organic growth assumptions of 5%-10% overall.  (*See* Perrigo Investor Presentation at Slide 13, Ex. 99.3 to Form 8-K filed with the SEC on Oct. 22, 2015).  The Perrigo Defendants made these same misrepresentations to other investors and the public.

46.     In reality, despite the Perrigo Defendants' flooding the marketplace with misstatements about Perrigo's purportedly robust 5%-10% organic growth—the Perrigo Defendants were well aware that Perrigo's organic growth had completely stalled at 0%-1% during the six quarters prior to Mylan's announcing its unsolicited bid in April 2015.  Indeed, during several of those quarters, Perrigo's organic growth was actually in the red.  For example, just months before the Mylan bid was announced, as of September 27, 2014 and December 27, 2014, Perrigo's organic growth was –9% and –0.2%, respectively.

47.     According to a then high-level employee in Perrigo's Consumer Health Care division in Omaha, Nebraska, who worked for the Company from 2011 through December 2015 ("Confidential Witness"), several significant product lines were being discontinued or downsized into 2015, which slowed Perrigo's organic growth.  These product lines included diabetes, infant formula, diet drugs, and supplements.  The Confidential Witness further reports that entire plants were being completely shut down by Perrigo, including in Colorado and South Carolina.  The Perrigo Defendants were at all material times aware of these facts.

48.     However, none of the information relating to the actual organic growth rates or declining product lines was shared with Highfields Capital, the public or other Perrigo shareholders at any time, including during the pendency of the Mylan tender offer.  Instead, the

Perrigo Defendants depicted a rosy (and materially false) historic performance and future outlook of Perrigo's organic growth based on that historic performance, all the while omitting key facts that formed the foundation of Perrigo's narrative to successfully defeat the Mylan tender offer.

**D.      The Perrigo Defendants Trumpeted the Purported Successful Integration and "Immediately Accretive" Growth Presented by Perrigo's Largest Acquisition, Omega Pharma, as a Primary Reason to Reject Mylan's Tender Offer.**

49.      To further discourage shareholders from supporting the Mylan tender offer, the Perrigo Defendants stressed the purportedly successful integration of and growth from Perrigo's recent—and largest—acquisition, Omega.  Omega was one of the largest over-the-counter healthcare companies in Europe, with commercial presence in 35 countries.  Perrigo acquired Omega for $4.5 billion, and the deal closed on March 30, 2015, just days before Mylan announced its unsolicited bid.

50.      Indeed, on April 21, 2015—shortly after the Mylan bid was announced—the Perrigo Defendants represented to Perrigo's shareholders, including Highfields Capital, that the Omega acquisition was "accretive to Perrigo's organic growth profile, and created additional value derived from synergies and increased global scale."  (*See* Perrigo Investor Presentation at Slide 24, Ex. 99.2 to Form 8-K filed on Apr. 21, 2015).  During an investor call on April 21, then-CEO Papa—despite his knowledge or reckless disregard of contrary facts—took it a step farther, representing that "we have just completed the Omega acquisition, which, among other benefits, provides a significantly enhanced international platform for additional growth" and "[w]e're very pleased with our initial integration projects with Omega . . . . As I talk about the growth of Omega from a historical point of view moving into the future, it has been accretive to our growth rate.  So, we're excited about that."   (THOMPSON REUTERS STREETEVENTS, Perrigo's Joseph C. Papa Presentation on Q3 2015 Results – Earnings Call Transcript, Apr. 21, 2015).

51.     Perrigo's "Expansive M&A" strategy—with Omega being its largest acquisition—
was also presented by the Perrigo Defendants to shareholders, including Highfields Capital, as one
of the major "plus" factors in Perrigo's "base plus plus plus" growth strategy, (*see* Perrigo Investor
Presentation, Ex. 99.2 to Form 8-K filed on Apr. 21, 2015), as follows:



52.     Building on that purported "plus" factor, Papa and Brown represented to Highfields
Capital representatives during their meeting on May 11, 2015, that the Omega acquisition allowed
Perrigo to expand its reach across Europe to a number of countries in which it did not previously
have a presence.  They further represented  that there "will be revenue synergies" that will quickly
add value to shareholders.

53.     In detailing the Omega integration efforts to shareholders, including Highfields
Capital, Papa professed to have detailed knowledge of the process.  For example, during a May

18, 2015 investor call, Papa stated that he personally had "a chance to work with the [integration] team," and further discussed specific details of purported ongoing integration, including identifying Omega products and channels that Perrigo had started to use, and provided purported details regarding the integration process itself. (*See* THOMPSON REUTERS STREETEVENTS, Perrigo's Joseph C. Papa Presentation – Call Transcript, May 18, 2015). Papa knew or recklessly disregarded that his statements were false and misleading in connection with the Omega integration, as outlined below.

54. Papa also represented during a June 2, 2015 investor call that "Omega and Perrigo together were well-positioned" to achieve a "5% to 10% growth," and described the Omega acquisition as "immediately accretive" to Perrigo's shareholders. Indeed, as of June 2015, Papa represented that he himself "had to integrate the Omega organization," which would have given him a bird's eye view into the significant problems Perrigo faced with the Omega integration. (THOMPSON REUTERS STREETEVENTS, Perrigo's Joseph C. Papa Presentation – Call Transcript, June 2, 2015).

55. The Perrigo Defendants also spoke at the Oppenheimer Consumer Conference on June 23, 2015 in Boston, Massachusetts, which Highfields Capital representatives and other Perrigo investors attended, during which Brown specifically highlighted the "great marriage" between Perrigo and Omega and described the acquisition as "accretive right away." (*See* THOMPSON REUTERS STREETEVENTS, Perrigo at Oppenheimer Consumer Conference Transcript, June 23, 2015). Brown stated that Perrigo's integration of Omega's international footprint with "35 countries in Europe, many brands, distribution reach" was "working smoothly." She further represented that the integration team "continues to do what their mission is and what they had been scheduled to do," while providing purported details on the mechanics of the integration process,

including manufacturing and supply chain capabilities, all of which were allegedly right "on track." (*Id.*). Again, Brown knew or recklessly disregarded material information that was squarely to the contrary of what she represented.

56.     Similarly, on August 5, 2015, during an earnings call with investors attended by Highfields Capital and other Perrigo shareholders, the Perrigo Defendants represented that Perrigo had already "delivered on our Omega integration plan" by "achiev[ing] great operational efficiencies and productivity improvement." (*See* Perrigo's Joseph C. Papa Presentation on Q2 2015 Results – Earnings Call Transcript, Aug. 5, 2015, *available at* https://seekingalpha.com/article/3403815-perrigo-plc-prgo-joseph-c-papa-on-q2-2015-results-earnings-call-transcript).

57.     The next day, August 6, 2015, the Perrigo Defendants met with Highfields Capital representatives in Boston.  During the meeting, they represented that the Omega transition was working so well that Omega would add its own organic growth to Perrigo at the "upper end" of Perrigo's historic 5%-10% organic growth range.

58.     The Perrigo Defendants also represented in October 2015 that the 2016 net sales for the BCH (Omega) segment would reach the 5%-10% guidance previously published and that the "integration and realization of synergies in relation to the acquisition of Omega Pharma . . . will proceed as planned and will not be subject to unforeseen material delays."  (Perrigo Profit Forecast Document at 7, Ex. 99.1 to Form 8-K filed with SEC on Oct. 22, 2015).  The Perrigo Defendants knew such representations were untrue at the time they were made, because the Omega integration was at that time anything but smooth, and Perrigo's sales and earnings were being negatively impacted.

59. Hence, in order to defeat the Mylan deal, the Perrigo Defendants continued to present the Omega acquisition as a big positive for the overall business because it purportedly provided strong geographic diversification and "immediate" bottom line revenue growth for Perrigo in line with its asserted historic growth rate of 5%-10%. But as the Perrigo Defendants knew at the time of their representations, Omega's own management modeled its long-term organic growth at just 3.2%, well below the "top end" of the 5%-10% range that was "immediately accretive" as represented by the Perrigo Defendants.

60. Just three months after touting the financial and other benefits of the Omega acquisition in order to defeat the Mylan bid, on February 18, 2016, Perrigo disclosed for the first time that various Omega assets required restructuring, and Perrigo took a $185 million impairment charge. (Perrigo Press Release at 4–5, Ex. 99.1 to Form 8-K filed with SEC on Feb. 18, 2016).

61. A few months later, on April 25, 2016, Perrigo announced that it was considering additional impairment charges for Omega—assets it previously showcased to its shareholders to fend off the Mylan bid. And on May 12, 2016, Perrigo announced another $467 million impairment charge for Omega, tripling the original impairment number, only months after the Perrigo Defendants praised the success of the Omega acquisition to shareholders. (Perrigo Press Release at 11, Ex. 99.1 to Form 8-K filed with the SEC on May 12, 2016).

62. Perrigo also announced that it would require "transformational organizational changes" at Omega as of August 2016, and on December 8, 2016, confirmed that Perrigo needed to restructure the entire branded division that consisted primarily of Omega assets. (Perrigo Press Release at 2, Ex. 99.1 to Form 8-K filed with the SEC on Aug. 10, 2016; Perrigo Press Release, Dec. 8, 2016, *available at* https://investor.perrigo.com/2016-12-08-Perrigo-Announces-Portfolio-Review-Developments-And-Intention-To-Restructure-Branded-Consumer-Healthcares-Belgium-

Business).  Perrigo's shares declined dramatically as a result of the announcement, and by year-end 2016, the concealed issues with Omega were so profound that Perrigo had accrued <u>over $2 billion</u> in impairment charges—nearly half of the total purchase price for Omega.

63.     The short time interval between the Perrigo Defendants' touting of Omega and those disastrous disclosures is no coincidence.  In truth, the Perrigo Defendants were aware of the issues that led to the impairment charges during the time they were opposing the Mylan takeover bid.  Indeed, the lack of synergies, integration problems, and underperformance of Omega from the outset of the acquisition in March 2015 are corroborated by a number of former employees of Perrigo.

64.     For example, Christine Kincaid, Perrigo's Global Cyber Security Manager from June 2015 through December 2015, was responsible for IT integration projects in Europe.  Ms. Kincaid has since disclosed that the IT integration between Perrigo and Omega had "completely stalled by mid-2015."  (Compl., *Roofers' Pension Fund v. Perrigo Co. plc,* No. 2:16-cv-02805-MCA-LDW, ECF No. 89 (D.N.J. June 21, 2017) ¶ 57 (hereinafter the "*Roofers'* Complaint")).  As the Global Cyber Security Manager, Kincaid reported directly to the Chief Information Officer ("CIO"), Tom Farrington, who in turn reported directly to Papa.  (*Id.*).  Kincaid reported that she regularly "met, spoke on conference calls, or emailed with senior level personnel at both Perrigo and Omega," and that "the Omega integration team had weekly reporting responsibilities to CIO Farrington."  (Am. Compl., *First Manhattan Co. v. Perrigo Co. PLC*, No. 2:18-cv-02291-MCA-LDW,  ECF  No.  9  (D.N.J.  Apr.  20,  2018)  ¶¶  106-107  (hereinafter  the  "*First  Manhattan* Complaint")).  The substantial Omega integration problems were reported by Farrington and his integration team and by Omega's personnel directly to Papa, Brown and Perrigo's Board during

the time that the Perrigo Defendants were falsely touting how successful the Omega integration was. (*Id.*).

65.     The Confidential Witness substantiated the fact that the success (or failure) of the Omega integration—as with any Perrigo acquisition—was carefully tracked at Perrigo at the executive level.  The Confidential Witness is familiar with Perrigo's integration process, and in fact went through that process first-hand when the Confidential Witness's own company was acquired by Perrigo.  The Confidential Witness reported that Perrigo had a full integration team—dedicated to integration work alone—based in Allegan, Michigan.  That integration team oversaw and tracked the entire integration process in detail, including by traveling on site, holding regular meetings and conference calls, providing relevant support and staff, maintaining up-to-date spreadsheets with tasks, due dates and responsible persons who were held accountable when an integration task was not timely completed.  The Confidential Witness described Perrigo's integration process as "demanding and rigorous" from the top-down.  Accordingly, the Perrigo Defendants were fully aware of the material problems they were having with Omega at the time they were falsely touting its success, in order to defeat the Mylan tender offer.

66.     Kincaid further has disclosed that "Perrigo leadership was told by Omega personnel that full migration of Omega data from each country location could not be completed based on the incompatible operating systems and applicable EU regulations, but that Perrigo continued to ignore the negative impact of the issue." (Compl., *Carmignac Getion, S.A. v. Perrigo Co. plc*, No. 2:17-cv-10467, ECF 1 (D.N.J. Nov. 1, 2017) ¶ 100 (hereinafter "*Carmignac* Complaint")).  Based on her regular conversations with CIO Farrington, Kincaid confirmed that Papa was directly informed of the Omega integration problems and that  CFO Brown "met with Farrington at least weekly and was aware of the integration issues and failures."  (*Id.* ¶¶ 103-104, 106).  Moreover, in August

2015—when the Perrigo Defendants were ramping up their campaign against the Mylan deal—
Mary Donovan, Perrigo's chief integration executive in Ireland, came to the U.S. and briefed
Perrigo about the "overall integration challenges with respect to Omega, including technology and
security issues." (*First Manhattan* Complaint ¶ 112).

67.     Kincaid explained that "during meetings and calls that took place during her tenure,
[CIO] Farrington confirmed that he reported the Omega data migration issues to Papa and sought
assistance at the highest levels—from Papa and Perrigo's Board—to remedy those issues." (*Id.* ¶ 109).  However, despite the Perrigo Defendants' knowledge of the Omega integration issues,
they consistently failed to provide Omega with meaningful assistance to remedy the problems
throughout 2015.  (*Carmignac* Complaint ¶ 104).  Another former employee who was the Senior
Global Compensation Analyst at Perrigo at the time further explained that relevant resources and
funding actually were diverted from the Omega integration in favor of defeating the Mylan deal. (*Roofers'* Complaint ¶ 62(d)).

68.     As noted above, the Perrigo Defendants touted that the Omega acquisition was
"immediately accretive" with a growth rate at the mid-point of the historic Perrigo organic growth
rate in the 5%-10% range.  However, Kincaid reported that "until at least the end of November
2015, Perrigo had no visibility into trends in the Omega sales or supply chain" and "had no access
to the underlying detail."  (*Carmignac* Complaint ¶ 91).  The Confidential Witness described the
Omega acquisition as something that was known during the relevant period as a "total write off"
that did not present <u>any</u> "immediate" accretive value or growth opportunities at Perrigo.  And
according to the information that was available to the Perrigo Defendants, as Perrigo's former
Director of Marketing explained, "the projected 7% growth was a fallacy because it was based on
products that were never actually released in the United States, and could not be marketed in the

United States the same way as in Europe due to known regulatory differences." (Compl., *Mason Capital L.P., et al. v. Perrigo Co., plc, et al.*, Dkt. No. 2:18-cv-01119, ECF 1 (D.N.J. Jan. 26, 2018) ¶¶ 57, 60 (hereinafter "*Mason Capital* Complaint")).

69.     Indeed, while the Perrigo Defendants were hyping Omega's "immediate" accretive value to investment analysts and their own shareholders, Perrigo's internal reports showed precisely the opposite: that Omega was substantially underperforming throughout 2015. (*Id.* ¶¶ 65–67). Additionally, according to the Confidential Witness, the Perrigo Defendants knew or recklessly disregarded that they could and would not realize any "immediate" accretion or synergies from the Omega acquisition, because the regulations and restrictions in the European Union are much stricter than in the United States, and therefore, economies of scale or possibilities for expansion or integration of Perrigo's and Omega's product lines was very limited.

70.     Despite the Perrigo Defendants' knowledge or reckless disregard of these material problems with the Omega acquisition and integration and performance, they continued to point shareholders to Omega's "value" as a key basis for rejecting the Mylan deal, which caused material harm to Highfields Capital.

**E.     The Perrigo Defendants Also Falsely Presented an Inflated Value for Perrigo's Largest Financial Asset: the Tysabri Royalty Stream.**

71.     On top of their misrepresentations about Perrigo's purported organic growth and the "immediately accretive" value of the Omega acquisition, the Perrigo Defendants also falsely presented the public and Perrigo's shareholders, including Highfields Capital, with another "plus" factor to defeat Mylan's bid. Specifically, the Perrigo Defendants falsely presented an inflated value of $5.8 billion for Perrigo's largest financial asset—the Tysabri royalty stream.

72.     Perrigo acquired a financial interest in the Tysabri royalty stream in 2013, which at the time of the Mylan tender offer represented approximately one-third of Perrigo's earnings.

Unlike Perrigo's core over-the-counter product business, Tysabri was a prescription drug manufactured and sold by Biogen, with Perrigo receiving a portion of the revenue stream. The Perrigo Defendants presented Tysabri as a blockbuster drug. During the pending Mylan tender offer, Papa persistently touted upside from Tysabri associated with new indications for additional treatments that would substantially increase Perrigo's royalty rate. (Perrigo Press Release, Sept. 17, 2015, *available at* https://www.biospace.com/article/releases/perrigo-rejects-unsolicited-mylan-bid-/).

73.    Specifically, the Perrigo Defendants repeatedly claimed that the Tysabri royalty stream was worth $5.8 billion with imminent huge "upside" given the stage of the clinical trials, landing it a top spot on the "base plus plus plus" pyramid Perrigo presented to its investors, including Highfields Capital, and the street:



(*See* Perrigo Investor Presentation, Ex. 99.2 to Form 8-K filed on Apr. 21, 2015).

74.     Additionally, on May 6, 2015, Papa falsely represented to Perrigo's shareholders, including to Highfields Capital representatives and other investors, at the Deutsche Bank Health Care Conference in Boston, Massachusetts, that the Tysabri clinical trials for the indications of stroke and secondary progressive multiple sclerosis were on track for success.   (*See* Perrigo Company plc: Company Conference Presentation, Deutsche Bank Healthcare Conference at 3, May 6, 2015).   Papa represented that these were important developments because approval for either or both of the indications would increase Perrigo's bottom line in at least two ways:  (1) the current purported $5.8 billion value would increase substantially because the base case valuation did not include these indications at all; and (2) the approval of either of these indications would propel Tysabri over and above the $2 billion threshold required to increase Perrigo's royalty percentage from Biogen.  During his presentation in Boston, Papa indicated that the Mylan tender offer completely undervalued the Tysabri asset given its purported $5.8 billion value and imminent upside, and should therefore be rejected.

75.     Indeed, throughout the summer and fall of 2015, Papa was very optimistic to his shareholders, including to Highfields Capital representatives, about Tysabri's clinical trials and contributions to Perrigo's growth.

76.     As the Perrigo Defendants were aware, the clinical trial for Tysabri as a treatment for stroke failed to meet its primary endpoint in June 2015, and the clinical trial for secondary progressive multiple sclerosis failed in October 2015.  Nevertheless, even as the clinical trials were failing, the Perrigo Defendants were falsely representing precisely the opposite in an effort to defeat the Mylan deal.

77.    On February 27, 2017, Perrigo stunned investors by announcing it would sell the Tysabri royalty stream for only $2.2 billion—billions of dollars less than the asset had been recorded on Perrigo's books and presented to investors throughout 2015 and into 2016.  (*See* Perrigo Press Release, Feb. 27, 2017, *available at* https://investor.perrigo.com/2017-02-27-Perrigo-Signs-Agreement-To-Divest-Tysabri-R-Royalty-Stream-For-Up-To-2-85-Billion).    As the Perrigo Defendants well knew, the so-called "plus" factor touted by the Perrigo Defendants to defeat the Mylan deal was actually deteriorating in value—a fact that did not become apparent to investors until late February 2017 when Perrigo sold the asset for only $2.2 billion.

78.    The Perrigo Defendants' misrepresentations and omissions in connection with Tysabri caused further substantial harm to Highfields Capital.

**F.    The Perrigo Defendants Falsely Represented That Perrigo Was Involved in a Bidding Process and That There Were Several "White Knights" on the Horizon in an Effort to Defeat the Mylan Deal.**

79.    Throughout the Mylan tender offer period, the Perrigo Defendants made false representations to their shareholders, including Highfields Capital, that they were engaged in a bidding process and were in active communications with multiple potential "white knights"—*i.e.*, other acquirers that would acquire Perrigo on better terms than Mylan.

80.    For example, on May 6, 2015, while speaking at the Deutsche Bank Health Care Conference in Boston, Massachusetts, Papa told Perrigo's shareholders, including Highfields Capital, that he would have to compare Mylan's bid to that of bids from "Companies A, B, C and D."  Specifically, Papa responded to an investor question about the Mylan bid by saying that he would "line up the bid against potential forthcoming offers from Company A, Company B, Company C and Company D."  These statements from Perrigo's CEO conveyed the clear but false impression to Highfields Capital and other shareholders that Perrigo was engaged in an active bidding process with at least four other potential buyers.

81.     Thereafter, on August 6, 2015 at Highfields Capital's offices in Boston, Papa reiterated that several other companies had called him expressing interest in acquiring Perrigo, and that Perrigo was affirmatively running a process to maximize value for the shareholders.

82.     Indeed, throughout the time when shareholders were considering the Mylan tender offer, the Perrigo Defendants reported that they were receiving "inbound calls" from other potential acquirers, and even went so far as to specifically mention the names of particular suitors, including Novartis and Johnson & Johnson by name in that context.

83.     These representations were intended to and did lead shareholders into believing that another, better acquisition was on the horizon.  Accordingly, the Perrigo Defendants' statements were yet another factor in the majority of Perrigo's shareholders ultimately rejecting Mylan's deal in November 2015.

84.     After the Mylan deal was rejected, in late November 2015, Perrigo's Investor Relations team told a very different story to Perrigo's shareholders admitting that in truth, Perrigo "never ran a process," that no advanced diligence was ever done by potential buyers, and that buyers did not want to be part of a hostile process.

85.     Similarly, had Perrigo been running a process with other potential acquirers, the Confidential Witness reported that the Confidential Witness would have been involved in any associated due diligence and contacted for a list of up-to-date business reports, patents and contracts from the Omaha office.  However, the Confidential Witness reported that the Confidential Witness was never contacted for any such information and was not told of a purported acquisition or bidder on the horizon or otherwise during the pendency of the Mylan bid.

86.     The Perrigo Defendants' material misrepresentations and omissions in connection with potential white knights caused substantial economic harm to Highfields Capital.

**G.     The Perrigo Defendants Made False Representations About Perrigo's Earnings, Causing Perrigo's Stock Prices to Plummet When Their Statements Unraveled.**

87.     Inextricably linked to the material misrepresentations made in connection with the Mylan tender offer, the Perrigo Defendants also issued inflated, unrealistic profit forecasts in 2015 guiding investors to expect 2016 earnings of $9.30 to $9.83 per share.  (*See* Perrigo Press Release, Oct. 22, 2015, *available at* https://investor.perrigo.com/2015-10-22-Perrigo-Taking-Actions-To-Deliver-Shareholder-Value-Far-Superior-To-Mylan-Offer).   As the Perrigo Defendants knew or recklessly disregarded, these projections were without <u>any</u> basis in fact, and indeed were totally contrary to any reasonable estimate.   The Perrigo Defendants made these false and misleading representations in order to induce Perrigo's shareholders to reject the Mylan tender offer, and to further entrench themselves in their lucrative executive positions at the Company.

88.     The earnings forecasts were of material importance to Perrigo's investors when Mylan's $26 billion offer was rejected by the majority of Perrigo's shareholders on November 13, 2015, ending Mylan's takeover bid.  After the Mylan deal was defeated, Papa publicly proclaimed: "I am delighted that Perrigo shareholders voiced their clear support for this management and our long-term strategy . . . . We have said all along that this offer from Mylan was a bad deal for our shareholders, as it significantly undervalued our durable business model and our industry-leading future growth prospects."  (*See* Al Jones, *Perrigo CEO 'delighted' that takeover was rejected, leadership supported*, M LIVE MEDIA GROUP, Nov. 13, 2015, *available at* https://www.mlive.com/business/westmichigan/index.ssf/2015/11/perrigo_ceo_delighted_that_ta k.html).  Indeed, to celebrate their victory against Mylan, Perrigo's executives, including Papa and Brown, hosted a champagne party at Perrigo's U.S. headquarters in Allegan, Michigan.

89.     However, immediately after the Perrigo Defendants achieved the fruits of their illicit scheme in fending off the Mylan bid, Perrigo lowered its 2016 earnings guidance just one quarter into 2016, to $8.20 to $8.60, almost 20 percent less than claimed just months before.

90.     Perrigo's lowered earnings guidance, along with the various 2016 and 2017 disclosures and restatements made in connection with Omega and the Tysabri royalty stream, caused Perrigo's shares to plummet.  The juxtaposition between Perrigo's stock prices in 2015 with its stock prices in 2016 and 2017—when the Perrigo Defendants' representations began to unravel—is startling, and the stock value has only continued to decline:



91.     So, for example, on February 18, 2016, Perrigo revealed that certain Omega assets had to be restructured, resulting in a $185 million impairment charge.  (*See* Perrigo Press Release, Ex. 99.1 to Form 8-K filed with the SEC on Feb. 18, 2016).  On this news, Perrigo shares fell

$14.77, or more than 10%, to close at $130.40.  On April 25, 2016—in conjunction with Papa's announcement that he was leaving Perrigo—Perrigo announced that it was considering additional impairment charges for Omega.  (*See* Perrigo Press Release, Ex. 99.1 to Form 8-K filed with the SEC on Apr. 25, 2016).  Based on these disclosures, the Perrigo shares again took a sharp hit, dropping by $21.95, or 18%, to close at $99.40.  On May 12, 2016, Perrigo announced another $467 million impairment charge for Omega, tripling the original impairment figure.  (*See* Perrigo Press Release, Ex. 99.1 to Form 8-K filed with the SEC on May 12, 2016).  On this news, Perrigo shares fell again.  Then on February 27, 2017, Perrigo stunned investors by announcing that it was selling the Tysabri royalty stream for $2.2 billion—representing several billions of dollars less than the valuation recorded on Perrigo's books and touted to investors.  (*See* Perrigo Press Release, Ex. 99.3 to Form 8-K filed with the SEC on Feb. 28, 2017).   On this news, Perrigo shares fell yet again.

92.    Perrigo's stock declined more than 62% from 2015, when the Perrigo Defendants made material false representations and misleading statements in order to fend off the Mylan deal, through 2017.

93.    Market commentators and analysts immediately noted that Perrigo's belated revelations stood in dramatic contrast to the Perrigo Defendants' promotion of Perrigo's value and growth during the Mylan bid.  Wells Fargo downgraded Perrigo's stock, noting that "Perrigo management set unrealistic and aspirational earnings guidance in its effort to defend against Mylan's hostile bid."  (Anne Steele, *As Its CEO Leaves for Valeant, Perrigo Continues to Struggle*, Wall Street Journal, Apr. 25, 2016).  A Barclays report similarly stated that the plummeting stock prices and Papa's sudden departure prompted "[n]o shortage of frustration . . . especially since the reset of expectations comes ~6 months after management convinced shareholders to rebuff

[Mylan's] tender offer."  A market analyst and commentator further observed that Papa publicly "talked about how the Mylan bid dramatically undervalued Perrigo . . . That was clearly untrue."

94.     Apparently seeing the writing on the wall, Perrigo's longtime CEO, Joe Papa—a main architect of the scheme to defeat the Mylan deal—resigned from Perrigo in April 2016, and joined Valeant Pharmaceuticals International, Inc. ("Valeant") as CEO and Chairman of the Board. On the heels of Papa's departure, newly appointed Perrigo CEO, John Hendrickson, stated that going forward, the new regime would now "try to be as transparent as possible" and issue "realistic" forecasts—implicitly acknowledging that this had not previously been the case. (Perrigo Plc (PRGO) John T. Hendrickson on Q1 2016 Results - Earnings Call Transcript, May 13, 2016, *available at* https://seekingalpha.com/article/3974804-perrigo-plc-prgo-john-t-hendrickson-q1-2016-results-earnings-call-transcript).

95.     When news broke in late February 2017 that Perrigo was examining various issues associated with Perrigo's purported grand jewel, the Tysabri royalty stream, Perrigo's longtime CFO, Judy Brown, also unexpectedly resigned.

96.     The Perrigo Defendants knew or recklessly disregarded contrary information when they made false and misleading representations in connection with Perrigo's earnings forecasts, which were yet another factor in defeating the Mylan bid, and caused material harm to Highfields Capital, including in connection with Perrigo's plummeting stock prices after the deal was rejected. Indeed, the Perrigo Defendants' false and misleading statements caused Perrigo's stock to fall more than 62% and robbed investors of the opportunity to fairly evaluate and participate in a takeover offer worth far more than Perrigo's current share price.

**H.**    **The Perrigo Defendants Had the Intent, Motivation and Opportunity to Mislead.**

97.    Papa and Brown were at all material times highly motivated to make material misrepresentations and deceitful statements in order to maintain Perrigo's independence and, in turn, their executive roles and high compensation and extra bonuses.

98.    As Perrigo's CEO and CFO, respectively, for nearly a decade when Mylan announced its unsolicited bid to buy the Company in April 2015, Papa and Brown were paid millions of dollars a year. Papa received total compensation of approximately $19,000,000 and $11,000,000 in 2014 and 2015, respectively, while Brown received total compensation of approximately $6,500,000 and $3,500,000 in 2014 and 2015, respectively. (*See* Perrigo Form 14A at 30, filed with the SEC on Mar. 17, 2016). That top dollar compensation was severely threatened by the Mylan deal, as the new regime would have replaced them. But by defeating the Mylan deal and Perrigo's remaining an independent company, Papa and Brown were able to further entrench themselves in their lucrative executive positions. Papa and Brown were even rewarded for their "key contributions related to Mylan's takeover attempt" in 2015 with a "special cash bonus" of $500,000 and $375,000, as well as restricted stock worth $1.5 million and $375,000, respectively. (*See* Perrigo Form PRE 14A at 30, filed with the SEC on Mar. 4, 2016).

99.    However, after the Mylan deal was defeated, the truth began to come to light. As detailed throughout this Complaint, the Perrigo Defendants knew or recklessly disregarded that Perrigo in fact had not been in the past, and was not able to achieve in the future based on past results, anywhere close to the organic growth rate it touted; had not successfully integrated its largest acquisition, Omega; had covered up the diminution in value of its largest asset, the Tysabri royalty stream; had not run any process that would materialize a "white knight," as represented; and had knowingly or recklessly provided inflated and unrealistic earnings forecasts.

100.     As their scheme began to unravel, Papa and Brown abruptly left their executive positions at Perrigo to start new roles at different companies.   Specifically, Papa resigned from Perrigo in April 2016 and joined Valeant as its CEO and Chairman of the Board, while Brown left Perrigo in February 2017 and joined Amgen as the Senior Vice President of Global Business Solutions and Finance.

## I.     The Perrigo Defendants' Scienter.

101.     The Perrigo Defendants devised their scheme to convince Perrigo's shareholders to reject the Mylan tender offer because they wanted Perrigo to remain an independent company that would continue to shower Defendants Papa and Brown with bonuses, high compensation and other benefits.   Indeed, both Papa and Brown stood to make substantial bonuses and continued compensation in the event the shareholders rejected the Mylan bid.   Therefore, as alleged throughout this Complaint, Papa and Brown pulled out all the stops to entrench themselves in their respective positions at an independent Perrigo, including:

(i)     The Perrigo Defendants, including Papa and Brown, were well aware or, at a minimum, recklessly disregarded that Perrigo did not maintain historic organic growth of 5%-10% per annum and that the past several quarters were barely breakeven.   Nevertheless, Papa and Brown hid that fact, and instead trumpeted to investors that Perrigo's "5%-10% historic organic growth" commanded a higher premium than Mylan's tender offer.   The Perrigo Defendants knew or, at a minimum, recklessly disregarded the fact that Perrigo's actual historic organic growth was only 0%-1% per annum in the last several quarters leading up to the Mylan bid.   Nonetheless, their greed and desire to remain at an independent Perrigo caused them to make false and misleading statements to their own shareholders.

(ii)    The Perrigo Defendants, including Papa and Brown, knew or, at a minimum, recklessly disregarded that Perrigo was experiencing very significant difficulties incorporating Omega into the Perrigo system, and yet they told shareholders the opposite: that the integration was going smoothly, and that the companies were experiencing strong synergies as a result of the acquisition—statements that they knew were completely false because they were personally involved in the integration efforts.

(iii)   The Perrigo Defendants also knew or recklessly disregarded the actual value of the Tysabri royalty stream—Perrigo's largest financial asset—as well as the fact that the drug was failing critical clinical trials during the pendency of the Mylan tender offer.  Instead of being up front with their shareholders, the Perrigo Defendants made false and misleading statements that the Tysabri royalty stream was worth $5.8 billion and was increasingly accretive to the earnings power at Perrigo.  Papa and Brown knew or recklessly disregarded that these statements were flatly false, particularly given the failures experienced at the clinical trials.  Yet, they continued to lie to the Perrigo shareholders in order to enhance their own circumstances.

(iv)    The Perrigo Defendants, including Papa and Brown, were well aware that Papa was not running any process with any potential suitor—and in fact that there were no other suitors for Perrigo besides Mylan.  Nevertheless, they conjured up a process out of whole cloth, which they knew to be completely false—even going so far as to name Novartis and Johnson & Johnson as so-called "white knights," who actually did not exist, simply so that they could continue to line their own pockets.

(v)     On top of all that, the Perrigo Defendants also knowingly or recklessly issued inflated, completely unrealistic profit forecasts both to Highfields Capital and to Perrigo's other investors in 2015, which were sharply reduced immediately after the Mylan deal was rejected.  All told, Perrigo's stock declined more than 62% during the period at issue, from 2015 to 2017.  Again, the Perrigo Defendants acted out of sheer avarice in enjoying this deceptive conduct and committing fraud.

102.    The Perrigo Defendants knowingly or recklessly made these false and misleading statements to Perrigo's shareholders in a variety of ways, including by meeting with Highfields Capital representatives and other investors in Boston, Massachusetts and other locations; by making investor presentations to Highfields Capital and other Perrigo shareholders in the Commonwealth of Massachusetts and throughout the country; by holding investor and earnings calls during which these misrepresentations were further disseminated to Perrigo's shareholders and to the public more generally; and by making false and misleading statements in Perrigo's public statements, press releases, regulatory filings and reports, as well as in Perrigo's NYSE and SEC filings, including its Forms 10-K.

103.    The Perrigo Defendants were involved in every one of these issues and were therefore aware or at a minimum recklessly disregarded that what they said and omitted to say to shareholders was false and misleading, but they made these misrepresentations anyway, in a totally selfish attempt to preserve Perrigo as an independent company and so that Papa and Brown could maintain their standing within the Company.

**J.      Perrigo's Public Certifications Were Materially False.**

104.    In their Certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, submitted with Perrigo's 2015 Form 10-K and Form 10-KT, Defendants Papa and Brown represented that (i) they had reviewed Perrigo's respective filings; (ii) the reports did "not contain

any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading"; and (iii) the "information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Perrigo]."  Additionally, each press release and presentation the Perrigo Defendants made in 2015 assured that:  "The directors of Perrigo accept responsibility for the information contained in this announcement [or presentation].  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement [or presentation] is in accordance with the facts and does not omit anything likely to affect the import of such information."  In fact, the Perrigo Defendants' representations about Perrigo's profit forecast based on historic results, organic growth, the Omega acquisition, and the Tysabri royalty stream were materially false and misleading.

105.    It was not until May 22, 2017 that Perrigo admitted that it actually had "material weaknesses" in its internal controls, and specifically, that it "did not maintain, in all material respects, effective internal control over financial reporting" throughout the Mylan bid.  (*See* Perrigo Form 10K at 40, filed with the SEC on May 22, 2017).  Accordingly, Papa and Brown knew or recklessly disregarded deficiencies from the investigation they claimed they conducted in their public filings.

106.    The Perrigo Defendants cannot insulate themselves through any safe harbor here. The statutory safe harbor provided to certain forward-looking statements does not apply to any of the false statements pled herein because they were not "forward-looking statements," were not identified as such when made, and were statements based on false historical results.

**K.     Highfields Capital and Perrigo's Shareholders Reasonably Relied on the Perrigo Defendants' Representations.**

107.     In making its investment decisions in connection with Perrigo, Highfields Capital and Perrigo's other shareholders reasonably relied on the materially false and misleading statements and omissions alleged herein.

108.     Throughout February 2015 through April 2016, Highfields Capital was engaged in the purchase and sale of Perrigo stock.   During that time, Highfields Capital undertook comprehensive asset valuation analyses and performed relevant research in connection with Perrigo, including but not limited to, the following sources of information:

   (a)     Perrigo's public statements and press releases;

   (b)     Perrigo's public filings with the SEC and the NYSE;

   (c)     Investor and earnings calls and transcripts that included Perrigo executives and investment relations representatives;

   (d)     Industry conferences and conference transcripts that included Perrigo executives and investment relations representatives;

   (e)     Meetings with Perrigo executives and personnel;

   (f)     Other regulatory filings and reports concerning Perrigo; and

   (g)     Analyst reports concerning Perrigo.

109.     Based upon the materially false or misleading statements and omissions of material fact, Perrigo's common stock traded at prices in excess of the true value of the shares throughout 2015, 2016, and portions of 2017.  Highfields Capital purchased Perrigo's common stock relying upon the integrity of the market price and other market information relating to Perrigo, based on Perrigo's representations and public statements and filings.

110.     Highfields Capital purchased Perrigo securities at artificially inflated prices during the time the Perrigo Defendants misrepresented or omitted to disclose material facts.  Additionally,

Highfields Capital relied upon the Perrigo Defendants to disclose material information as required by law and in Perrigo's SEC filings.  It was not until approximately February 27, 2017 and May 22, 2017 that a number of the Perrigo Defendants' false representations and unfair and deceptive conduct came to light.

111.    Furthermore, there is a presumption that other shareholders relied upon the material misrepresentations because, among other things:

(a)    The Perrigo Defendants made public misrepresentations or failed to disclose material facts during the relevant period;

(b)    The misrepresentations and omissions were material;

(c)    The Company's securities traded in efficient markets;

(d)    The misrepresentations and omissions alleged would induce a reasonable investor to misjudge the value of the Company's securities and therefore the relative value of the Mylan tender offer;

(e)    Shareholders purchased Perrigo securities between the time the Perrigo Defendants misrepresented or failed to disclose material facts, and the time the true facts were disclosed without knowledge of the misrepresented or omitted facts; and

(f)    The claims asserted herein against the Perrigo Defendants are primarily predicated upon omissions of material fact for which there was a duty to disclose.

112.    Highfields Capital was further harmed by other shareholders' reliance on the Perrigo Defendants' misrepresentations because it was deprived of the opportunity to sell its shares at the price offered by the Mylan tender offer.

## COUNT I
### (Unfair Business Methods (M.G.L. c. 93A § 11))
### (*Perrigo, Joseph Papa, Judy Brown*)

113.    The allegations contained in the above paragraphs, other than paragraphs 101 through 103, are hereby incorporated by reference as if fully set forth herein.

114.    At all times relevant to this action, Plaintiff Highfields Capital, and Defendants Perrigo, Joseph Papa and Judy Brown have been engaged in trade or commerce within Massachusetts within the meaning of M.G.L. c. 93A, § 11.

115.    As alleged above, Defendants Perrigo, Papa and Brown engaged in a course of conduct designed to unfairly and deceptively harm Highfields Capital, to Perrigo's, Papa's and Brown's advantage.   Perrigo, Papa and Brown engaged in this unfair and deceptive conduct primarily and substantially within Massachusetts—by traveling to the Commonwealth where they directly made misrepresentations to investors, including Highfields Capital; by making misrepresentations and omissions that reached Massachusetts investors, including through SEC filings, public statements and reports, press releases, meetings, investor calls, and conferences; by causing harm to Highfields Capital, which was felt in the Commonwealth; and by otherwise engaging in trade and commerce within the Commonwealth, to the detriment of those within Massachusetts.

116.    The unfair and deceptive acts and practices of Defendants Perrigo, Papa, and Brown harmed Highfields Capital in the Commonwealth by, at minimum, (1) tortiously interfering with Highfields Capital's opportunity to tender its Perrigo common stock in exchange for the combination of cash and Mylan stock offered by Mylan through the tender offer; and (2) inducing Highfields Capital to purchase Perrigo stock at inflated prices during the period in which the Mylan tender offer was pending and thereafter.

117.    The acts and practices of Defendants Perrigo, Papa, and Brown alleged herein constitute unfair methods of competition or unfair or deceptive acts and practices and business transactions that occurred primarily and substantially within Massachusetts within the meaning of M.G.L. c. 93A § 2.

118.    As a result of the Perrigo Defendants' unfair and deceptive conduct, Highfields Capital incurred damages amounting to at least $185 million.

119.    These unfair methods of competition or unfair or deceptive acts or practices were intentional, willful, and knowing, and subject to treble damages.

## COUNT II
### (Violations of Section 14(e) of the Exchange Act)
### (*Perrigo, Joseph Papa, Judy Brown*)

120.    The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

121.    Section 14(e) provides: "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer."

122.    Defendants Perrigo, Papa, and Brown violated their respective obligations under Section 14(e) because the Perrigo Defendants made the materially false or misleading statements or omissions of material fact set forth above in connection with Mylan's tender offer.

123.    Those misstatements and omissions were material, in that a reasonable investor would have deemed those facts important in determining whether to purchase and tender its shares of Perrigo stock in connection with the tender offer.  Indeed, as pled above, a majority of

shareholders were induced to reject the Mylan tender offer on the basis of Perrigo's, Papa's, and Brown's misrepresentations, and Highfields Capital was thus prevented from obtaining the fruits of the Mylan offer.

124.    The Perrigo Defendants intentionally or recklessly engaged in acts, practices, and a course of conduct that was fraudulent, deceptive or manipulative when issuing their false or misleading statements or omissions of material fact in violation of Section 14(e) of the Exchange Act.  Throughout the pendency of the Mylan tender offer, and while in possession of material, adverse, nonpublic information, the Perrigo Defendants used the means and instrumentalities of interstate commerce—including traveling to Massachusetts—to engage in false and misleading statements, the U.S. mails, and the facilities of the national securities exchanges to make the materially false or misleading statements and omissions of material fact alleged herein to: (i) knowingly or recklessly deceive Perrigo shareholders with respect to Perrigo's operations, business, performance and prospects; (ii) cause the market price of Perrigo common stock to trade above its true value; and (iii) induce a majority of Perrigo shareholders to reject Mylan's tender offer.

125.    As a direct and proximate result of Defendant Perrigo's, Papa's, and Brown's wrongful conduct, Highfields Capital suffered damages in connection with their holdings of Perrigo common stock as of the expiration of Mylan's tender offer because the tender offer, which was defeated as a result of the Perrigo Defendants' material misrepresentations and omissions, would have provided Highfields Capital with substantially more value than holding their Perrigo common stock, which continued to deflate in value as the full extent of Perrigo's, Papa's, and Brown's misrepresentations were unveiled as of February and May 2017 and thereafter.

126.    As a direct and proximate result of the Perrigo Defendants' violations of Section 14(e) of the Exchange Act, Perrigo's shareholders were prevented from fairly assessing Mylan's tender offer, and Highfields Capital was induced into continuing to purchase Perrigo stock in advance of the tender offer and after the tender offer and was deprived of the opportunity to exchange its Perrigo shares for superior compensation in cash and stock.  As a result, Highfields Capital incurred significant damages amounting to at least $185 million.

127.    As a result of such conduct, the Perrigo Defendants are liable pursuant to Section 14(e) of the Exchange Act.

### COUNT III
**(Violations of Section 20(a) of the Exchange Act)**
**(*Joseph Papa, Judy Brown*)**

128.    The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

129.    Defendant Papa was the CEO and Chairman of the Board of Perrigo from the fall of 2006 through April 2016, and was one of the primary actors in Perrigo's attempts to defeat the Mylan tender offer, as described herein.  Papa was directly involved in the day-to-day management of Perrigo, including its communications to investors, and he traveled to Boston, Massachusetts to meet with, and made misleading statements to Perrigo's shareholders, including Highfields Capital, in connection with the Mylan deal.  As a result, he had the power and ability to control the actions of Perrigo, and acted as a controlling person of Perrigo within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of Perrigo until his resignation, and is liable for Perrigo's violations of the Exchange Act, as alleged above, during that time.

130.    Defendant Papa further signed periodic public filings on behalf of Perrigo, and certified those filings pursuant to Sarbanes-Oxley.  As a result, Papa exercised control over

Perrigo's public statements and reports, selection of accounting treatment, the recording of its financial statements, and its decisions to comply or not comply with GAAP.  Such conduct further qualifies Papa as a control person of Perrigo within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of Perrigo regarding its representations in connection with the Omega acquisition, the accounting for the Tysabri royalty stream, as well as all other material misrepresentations made in Perrigo's public statements or reports and SEC filings as alleged above, and is liable for Perrigo's violations of the Exchange Act related thereto.

131.    Defendant Brown was the CFO of Perrigo from July 2006 through February 2017, and was another of the primary actors in Perrigo's attempt to defeat the Mylan tender offer, as alleged above.  Brown was directly involved in the day-to-day management of Perrigo including its communications to investors, and she traveled to Boston, Massachusetts to meet with, and made misleading statements to Perrigo's shareholders, including Highfields Capital, in connection with the Mylan tender offer.  As a result, she had the power and ability to control the actions of Perrigo, and acted as a controlling person of Perrigo within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of Perrigo until her resignation, and is liable for Perrigo's violations of the Exchange Act, as alleged above, during that time.

132.    Defendant Brown further signed periodic public filings on behalf of Perrigo, and certified those filings pursuant to Sarbanes-Oxley.  As a result, Brown exercised control over Perrigo's public statements and reports, selection of accounting treatment, the recording of its financial statements, and its decisions to comply or not comply with GAAP.  Such conduct further qualifies Brown as a control person of Perrigo within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of Perrigo regarding its representations in connection with Omega acquisition its accounting for the Tysabri royalty stream, as well as all other material

misrepresentations made in Perrigo's public statements or reports and SEC filings as alleged above, and is liable for Perrigo's violations of the Exchange Act related thereto.

133.    As a result of Defendants Papa's and Brown's violations of Section 20(a) of the Exchange Act, Highfields Capital incurred damages amounting to at least $185 million.

**COUNT IV**
**(Violations of Section 18 of the Exchange Act)**
**(*Perrigo, Joseph Papa, Judy Brown*)**

134.    The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

135.    As set forth above, at all relevant times to this action, Defendants Perrigo, Papa and Brown made or caused to be made statements in Perrigo's Forms 10-K and public filings and reports with the SEC which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts.

136.    Perrigo was required to file reports on Forms 10-K and other public filings pursuant to Section 13(a) and 15(d) of the Exchange Act, as well as the rules and regulations promulgated thereunder.

137.    In connection with making its decision to purchase Perrigo common stock, Plaintiff Highfields Capital read and relied upon the statements made by the Perrigo Defendants in the Forms 10-K and other public filings or reports at all times relevant to this action.  Plaintiff Highfields Capital reasonably relied upon the Perrigo Defendants' statements as being materially complete and not misleading, and as not omitting material information, including information relating to the Omega acquisition, the Tysabri royalty stream, Perrigo's earnings, as well as all other material representations pled herein.  Plaintiff Highfields Capital did not know that the statements were false or misleading at the time they were made.

138.    In reasonable reliance upon the materially false or misleading statements included in Perrigo's public filings with the SEC, Plaintiff Highfields Capital purchased Perrigo common stock at artificially inflated prices.

139.    As the truth emerged regarding the materially false or misleading statements contained in Perrigo's public filings with the SEC, Perrigo's common stock declined, causing damages to Plaintiff Highfields Capital.

## COUNT V
### (Tortious Interference with Prospective Economic Advantage)
### (*Perrigo, Joseph Papa, Judy Brown*)

140.    The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

141.    As a result of Highfields Capital's status as a shareholder in Perrigo during the pendency of the Mylan tender offer, and the representations made by Perrigo, it had the reasonable expectation of economic advantage by participation in the Mylan tender offer—an offer which was legally binding upon Mylan so long as 50% of Perrigo shareholders tendered their shares before the November 13, 2015 deadline.

142.    Defendants Perrigo, Papa, and Brown unlawfully interfered with these prospective relationships by making misrepresentations to their shareholders, and engaging in other unfair methods, to overvalue Perrigo's shares during the pendency of the Mylan tender offer, and encourage shareholders to reject the Mylan tender offer.

143.    Specifically, and as alleged above, Perrigo, Papa, and Brown engaged in a course of conduct designed to harm Highfields Capital, and tortiously interfered with its prospective economic advantage presented by the Mylan tender offer.  Perrigo, Papa and Brown engaged in this conduct within Massachusetts—by traveling to the Commonwealth where they directly made

misrepresentations to investors, including Highfields Capital; by making misrepresentations and omissions that reached Massachusetts investors, including through SEC filings, public statements and reports, press releases, meetings, investor calls, and conferences; by causing harm to Highfields Capital, which was felt in the Commonwealth; and by otherwise engaging in trade and commerce within the Commonwealth, to the detriment of those within Massachusetts.

144.    As a result of the Perrigo Defendants' unlawful conduct, the Mylan tender offer was ultimately rejected by a majority of shareholders, and Highfields Capital was deprived of the prospective economic advantage offered by the Mylan tender offer.   As a further result of the alleged misconduct, the Perrigo shares dropped in value significantly and Highfields Capital suffered a loss of at least $185 million.

145.    The Perrigo Defendants' conduct was intentional, with malice, with improper motive and means, without legal justification, and designed to injure its shareholders including Highfields Capital.

146.    As a direct and proximate cause of the Perrigo Defendants' malicious and tortious conduct, Highfields Capital suffered loss, harm and irreparable damage.

<u>**COUNT VI**</u>
**(Common Law Fraud)**
**(*Perrigo, Joseph Papa, Judy Brown*)**

147.    The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

148.    As alleged herein, Defendants Perrigo, Papa, and Brown knowingly or recklessly made misrepresentations of material fact, and knowingly or recklessly omitted material facts, throughout the pendency of the Mylan tender offer and thereafter.   The Perrigo Defendants

continued to cover up the full extent of these misrepresentations well into 2017, so that the full extent of their misconduct would not be discovered.

149.     Defendants engaged in such actions in order to induce Highfields Capital and other investors to rely upon such statements in making their investment decisions in connection with Perrigo and to reject the Mylan tender offer.

150.     Plaintiff Highfields Capital relied upon the misrepresentations and omissions of Defendants Perrigo, Papa and Brown in its decision to continue to purchase Perrigo shares both in advance of the Mylan tender offer and after the bid was rejected.  Highfields Capital was harmed as a result of these misrepresentations.

151.     Highfields Capital was further harmed by Defendants Perrigo's, Papa's and Brown's misrepresentations because the majority of Perrigo shareholders were induced to reject the Mylan tender offer, thereby depriving Highfields Capital of the opportunity to tender its Perrigo common stock in exchange for the combination of cash and Mylan stock offered by Mylan through the tender offer.

152.     As a result of the Perrigo Defendants' fraudulent conduct, Highfields Capital incurred damages amounting to at least $185 million.

153.     These false and misleading statements and omissions of material facts were made intentionally, willfully, recklessly, or knowingly by Perrigo, Papa and Brown.

**<u>COUNT VII</u>**
**(Negligent Misrepresentation)**
**(*Perrigo, Joseph Papa, Judy Brown*)**

154.     The allegations contained in the above paragraphs, other than paragraphs 101 through 103, are hereby incorporated by reference as if fully set forth herein.

155.    Defendants Perrigo, Papa and Brown, in the course of conducting their business and through their business transactions, supplied false information for the guidance of others, including Highfields Capital, as alleged above.

156.    Defendants Perrigo, Papa and Brown provided such false information while transacting business in Massachusetts in meetings directly with Highfields Capital representatives and other investors, and to the investor community at large, including Perrigo's Massachusetts investors, including through SEC filings, public statements and reports, press releases, meetings, investor calls, and conferences.

157.    As a result of Defendants Perrigo's, Papa's and Brown's misrepresentations and omissions, Plaintiff Highfields Capital suffered pecuniary harm because (1) the majority of Perrigo shareholders were induced to reject the Mylan tender offer, thereby depriving Highfields Capital of the opportunity to tender its Perrigo common stock in exchange for the combination of cash and Mylan stock offered by Mylan through the tender offer; and (2) Highfields Capital was induced to purchase Perrigo stock at inflated or inaccurate prices both during the period in which the Mylan tender offer was pending and thereafter.

158.    Highfields Capital, and other Perrigo investors, justifiably relied upon the representations made by Defendants Perrigo, Papa and Brown in direct one-on-one meetings, through SEC filings, public statements and reports, press releases, investor calls, conferences and other public representations.  Indeed, investors typically rely upon these sources of information in order to make informed investment decisions and Defendants Perrigo, Papa, and Brown certified the accuracy of their misleading statements, including through Sarbanes-Oxley certifications.

159.    As a result of the Perrigo Defendants' conduct, Highfields Capital incurred damages amounting to at least $185 million

160.     Defendants Perrigo, Papa, and Brown failed to exercise reasonable care or competence in obtaining or communicating the misrepresentations and omissions outlined above.

## COUNT VIII

### (Unjust Enrichment)
### (*Perrigo, Joseph Papa, and Judy Brown*)

161.     The allegations contained in the above paragraphs, other than paragraphs 101 through 103, are hereby incorporated by reference as if fully set forth herein.

162.     Based on the conduct alleged in this Complaint, Defendants Perrigo, Papa and Brown unjustly and knowingly enriched themselves at the direct expense of Highfields Capital and other Perrigo investors.

163.     Defendants Perrigo's, Papa's and Brown's economic benefit is a direct and proximate result of their unjust and unconscionable conduct by making material misrepresentations and omissions to Highfields Capital and other shareholders in an effort to overstate the value of Perrigo and thereby induce shareholders to reject the Mylan tender offer. Defendant Perrigo was unjustly enriched because its conducts allowed it to remain and independent company, with all benefits derived from revenues, assets and investments flowing directly to it.  Defendants Papa and Brown were also unjustly enriched by their conduct because they maintained control over Perrigo—and hence remained in their executive roles of CEO and CFO, respectively; maintained their high compensation and stock options; and even obtained large cash and stock bonuses from Perrigo as a "reward" for defeating the Mylan tender offer.

164.     But for the Perrigo Defendants' unjust and inequitable conduct, Highfields Capital would have had the opportunity to tender its Perrigo shares in exchange for the combination of cash and Mylan stock offered by Mylan through the tender offer.  Instead, it lost approximately $185 million dollars as a result of purchasing Perrigo shares.

165. But for the Perrigo Defendants' unjust and inequitable conduct, Highfields Capital would not have continued to purchase Perrigo stock at inflated or inaccurate prices during the period in which the Mylan tender offer was pending or thereafter.

166. Equity and good conscience require restitution from the Perrigo Defendants. Moreover, to protect Highfields Capital's right to recover damages and to prevent the unjust enrichment of Perrigo, Papa and Brown, a constructive trust should be imposed on all sums unlawfully and inequitably received by Perrigo, Papa and Brown traceable to their misconduct, including but not limited to Papa's and Brown's respective shares of Perrigo.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Highfields Capital respectfully requests that this Court enter judgment in their favor and against Defendants Perrigo, Joseph Papa, and Judy Brown, as follows:

A. A declaration in favor of Highfields Capital and against Perrigo, Joseph Papa, and Judy Brown on each Count contained herein and a final judgment incorporating the same;

B. An award of compensatory damages in favor of Plaintiff Highfields Capital and against all Defendants, jointly and severally, for all damages sustained as a result of the Perrigo Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. An award of three times Highfields Capital's actual damages for Perrigo's, Joseph Papa's, and Judy Brown's respective unfair trade practices and deceptive conduct;

D. An award of punitive damages to Highfields Capital;

E. An award of Plaintiff Highfields Capital's reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

F.     A constructive trust over the assets and shares of Perrigo, including any and all shares owned by Joseph Papa or Judy Brown; and

G.     Such other and further relief as the Court deems just and appropriate under the circumstances.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Highfields Capital demands a trial by jury of all issues so triable.

Dated: February 14, 2019

/s/ *Harvey J. Wolkoff*
Harvey J. Wolkoff (BBO# 532880)
Aliki Sofis (BBO# 675777)
Kaitlyn M. O'Connor (BBO# 687527)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199
Tel: (617) 712-7100
harveywolkoff@quinnemanuel.com
alikisofis@quinnemanuel.com
kaitoconnor@quinnemanuel.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 14th day of February, 2019.

/s/ <i>Harvey J. Wolkoff</i>

Harvey J. Wolkoff